

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Criminal Division*
*Fraud Section*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza 950*
*New York, New York 10007*

*Bond Building*
*1400 New York Ave, NW*
*11th Floor*
*Washington, D.C. 20005*

November 26, 2019

Cheryl J. Scarboro
Joshua A. Levine
Diana C. Wielocha
Simpson Thacher & Bartlett LLP
900 G Street, NW
Washington, D.C. 20001

**19 CRIM 884 (AJN)**

Re:   *United States v. Telefonaktiebolaget LM Ericsson* Deferred Prosecution
       Agreement

Dear Counsel:

Defendant Telefonaktiebolaget LM Ericsson (the "Company"), pursuant to authority

granted by the Company's Board of Directors reflected in Attachment B, which is incorporated by

reference into this Agreement, and the United States Department of Justice, Criminal Division,

Fraud Section (the "Fraud Section") and the Office of the United States Attorney for the Southern

District of New York (the "Office") (collectively, the "United States"), enter into this deferred

prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section and the Office will

file the attached two-count criminal Information in the United States District Court for the

Southern District of New York charging the Company with one count of conspiracy to commit an

1

offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, *see* Title 15, United States Code, Section 78dd-1, and one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the books and records and internal controls provisions of the FCPA, *see* Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(2)(B), and 78m(b)(5).  In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts"), which is incorporated by reference into this Agreement, and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of New York.  The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.       The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. Should the Fraud Section or the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the attached Statement of Facts in any proceeding

by the Fraud Section or the Office, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 11-14 below (the "Term"). The Company agrees, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section and the Office's right to proceed as provided in Paragraphs 17-19 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

## Relevant Considerations

4.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

       a.      The Company did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") 9-47.120, or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because it did not voluntarily self-disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

       b.      The Company received partial credit for its cooperation with the Fraud Section and the Office's investigation, including conducting a thorough internal investigation; making regular factual presentations to the Fraud Section and the Office; providing facts learned during witness interviews conducted by the Company; voluntarily making foreign-based employees available for interviews in the United States; producing extensive documentation, including documents located outside of the United States as well as translations of foreign language documents; and proactively disclosing some conduct of which the Fraud Section and the Office were previously unaware;

       c.      The Company did not receive full credit for cooperation and remediation pursuant to the FCPA Corporate Enforcement Policy, JM 9-47.120, because it did not disclose allegations of corruption with respect to two relevant matters, produced certain relevant materials in an untimely manner, and did not timely and fully remediate, including by failing to take adequate disciplinary measures with respect to certain executives and other employees involved in the misconduct;

       d.      Although the Company had inadequate anti-corruption controls and an inadequate anti-corruption compliance program during the period of the conduct described in the Statement of Facts, the Company has been enhancing and has committed to continuing to enhance

its compliance program and internal accounting controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program"), which is incorporated by reference into this Agreement;

      e.    Because the Company has not yet fully implemented or tested its compliance program, the Company has agreed to the imposition of an independent compliance monitor to reduce the risk of misconduct (as set forth in Paragraphs 11-14 and Attachment D to this Agreement);

      f.    The nature and seriousness of the offense conduct, including the payment of bribes to high-level government officials in Djibouti, as well as significant books and records and internal controls violations in Djibouti, China, Vietnam, Indonesia, and Kuwait, over a period of years which included the involvement of high-level executives at the Company;

      g.    The Company has no prior criminal history; and

      h.    The Company has agreed to continue to cooperate with the Fraud Section and the Office in any ongoing investigation as described in Paragraph 5 below;

      i.    The Company has agreed to resolve with the U.S. Securities and Exchange Commission ("SEC") through a civil complaint and injunction that will be filed on December 6, 2019, relating to the conduct described in the Statement of Facts, as well as conduct in Saudi Arabia, and has agreed to pay $458,380,000 in disgorgement and pre-judgment interest of $81,540,000.

      j.    Accordingly, after considering (a) through (i) above, the Fraud Section and the Office believe that the appropriate resolution in this case is a deferred prosecution agreement with the Company; a criminal monetary penalty of $520,650,432, which reflects an aggregate

discount of fifteen percent off the bottom of the otherwise-applicable U.S. Sentencing Guidelines fine range; the imposition of an independent compliance monitor; and a guilty plea by the Company's subsidiary Ericsson Egypt Ltd. ("Ericsson Egypt").

### Future Cooperation and Disclosure Requirements

5.      The Company shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section and the Office at any time during the Term, subject to applicable laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Fraud Section and the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its subsidiaries or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts. The Company's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such assertion. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

6

a.      The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record, or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

b.      Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, all meetings requested by the Fraud Section and the Office, and interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters being investigated or prosecuted.

d.    With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

6.    In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.

## Payment of Monetary Penalty

7.    The Fraud Section and the Office and the Company agree that application of the United States Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.    The November 1, 2018 version of the U.S.S.G. is applicable to this matter.

b.    <u>Offense Level</u>. Based upon U.S.S.G. § 2C1.1, the total offense level is 46, calculated as follows:

| | |
|---|---|
| (a)(2)   Base Offense Level | 12 |
| (b)(1)   Multiple Bribes | +2 |
| (b)(2)   Value of Benefit Received (more than $250,000,000 but not more than $550,000,000) | +28 |
| (b)(3) Involvement of High-Level Public Official | +4 |

8

| | | |
|---|---|---|
| **TOTAL** | | 46 |

c.   Base Fine.   Based upon U.S.S.G. § 8C2.4(a)(2) the base fine is $382,831,200.

d.   Culpability Score.  Based upon U.S.S.G. § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 8 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $382,831,200 |
| Multipliers | 1.60(min)/3.20(max) |
| Fine Range | $612,529,920 |
| | $1,225,059,840 |

The Company agrees to pay a total monetary penalty in the amount of $520,650,432 (the "Total Criminal Fine"), $9,520,000 of which will be paid as a criminal fine by the Company on behalf of Ericsson Egypt, as part of Ericsson Egypt's guilty plea.  The Total Criminal Fine will be paid to the United States Treasury within ten business days of the sentencing hearing by the Court of Ericsson Egypt in connection with its guilty plea and plea agreement entered into simultaneously

herewith.  The Company and the Fraud Section and the Office agree that this penalty is appropriate

given the facts and circumstances of this case, including the Relevant Considerations described in

Paragraph 4 of this Agreement.  The Total Criminal Fine is final and shall not be refunded.

Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section and

the Office that the Total Criminal Fine is the maximum penalty that may be imposed in any future

prosecution, and the Fraud Section and the Office are not precluded from arguing in any future

prosecution that the Court should impose a higher fine, although the Fraud Section and the Office

agree that under those circumstances, it will recommend to the Court that any amount paid under

this Agreement should be offset against any fine the Court imposes as part of a future judgment.

The Company acknowledges that no tax deduction may be sought in connection with the payment

of any part of the Total Criminal Fine.  The Company shall not seek or accept directly or indirectly

reimbursement or indemnification from any source with regard to the penalty or disgorgement

amounts that the Company pays pursuant to this Agreement or any other agreement entered into

with an enforcement authority or regulator, including the SEC, concerning the facts set forth in the

attached Statement of Facts.

### **Conditional Release from Liability**

8.      Subject to Paragraphs 17-19, the Fraud Section and the Office agree, except as

provided in this Agreement and in the plea agreement between the Fraud Section and the Office

and Ericsson Egypt, dated November 26, 2019, that they will not bring any criminal or civil case

against the Company or any of its direct or indirect affiliates, subsidiaries, or joint ventures,

relating to any of the conduct described in the attached Statement of Facts or the criminal

Information filed pursuant to this Agreement.  The Fraud Section and the Office, however, may

use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

        a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

        b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

9.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

10.      In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures, regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to modify its existing compliance program, including internal controls, compliance policies,

and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.  In assessing the company's compliance program, the Fraud Section and the Office, in their sole discretion, may consider the Monitor's certification decision.

## Independent Compliance Monitor

11.     Promptly after the Fraud Section and the Office's selection pursuant to Paragraph 13 below, the Company agrees to retain a Monitor for the term specified in Paragraph 14.  The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Fraud Section and the Office, are set forth in Attachment D, which is incorporated by reference into this Agreement.  Within forty-five business days after the date of execution of this Agreement, the Company shall submit a written proposal identifying the Monitor candidates, and, at a minimum, provide the following:

a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b.     a written certification by the Company that it will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

12

      c.      a written certification by each of the candidates that he/she is not a current or recent (i.e., within the prior two years) employee, agent, or representative of the Company and holds no interest in, and has no relationship with, the Company, its subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

      d.      a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Fraud Section or the Office, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

      e.      A statement identifying the Monitor candidates who are the Company's first, second, and third choice to serve as the monitor.

    12.      The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

      a.      demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

      b.      experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

      c.      the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

      d.      sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

13.     The Fraud Section and the Office retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Company. Any submission or selection of a Monitor candidate by either the Company or the Criminal Division should be made without unlawful discrimination against any person or class of persons. If the Fraud Section and the Office determine, in their sole discretion, that any or all of the three candidates lack the requisite qualifications, it shall notify the Company and request that the Company propose another candidate or candidates within twenty business days. This process shall continue until a Monitor acceptable to both parties is chosen. The Fraud Section and the Office and the Company will use their best efforts to complete the selection process within sixty calendar days of the execution of this Agreement. The Fraud Section retains the right to determine that the Monitor should be removed as the Monitor if, in the Fraud Section's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 12 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within twenty business days recommend a pool of three qualified Monitor candidates from which the Fraud Section and the Office will choose a replacement, following the process outlined above.

14.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension or early termination as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Company

discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with resolutions with foreign or other domestic authorities.

## Deferred Prosecution

15.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term, except as provided in the plea agreement between the Fraud Section and the Office and Ericsson Egypt, dated November 26, 2019. To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

16.     The Fraud Section and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months of the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

## Breach of the Agreement

17.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading

information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any act that, had it occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the U.S. District Court for the Southern District of New York or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section and the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of

limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

18.     In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

19.     In the event that the Fraud Section and the Office determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony

made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

20.     The Company acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to Paragraphs 5 and 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

22.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to

18

the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section and the Office's ability to declare a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section and the Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 17-19 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

## Public Statements by Company

23.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 17-20 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office. If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section and the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

24.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office and the Company; and (b) whether the Fraud Section and the Office have any objection to the release or statement.

25.     The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.   By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

26.     This Agreement is binding on the Company and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Notice

27.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave., NW, 11th Floor, Washington, DC 20005 and Chief, Criminal Division, United States Attorney's Office for the Southern District of New York, 1 St. Andrew's Plaza, New York City, NY 10007.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Laurie Waddy, Chief Compliance Officer, Telefonaktiebolaget LM Ericsson, Torshamnsgatan 21, 164 80, Stockholm, Sweden, and Cheryl J. Scarboro, Simpson, Thacher & Bartlett LLP, 900 G. Street, NW, Washington, DC 20001. Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company.

### Complete Agreement

28.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section and the Office.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company, and a duly authorized representative of the Company.

**AGREED:**
**FOR TELEFONAKTIEBOLAGET LM ERICSSON:**

Date: _Nov 26, 2019_                    By: _____

                                    Xavier Dedullen
                                      Senior Vice President
                                      Chief Legal Officer
                                      Telefonaktiebolaget LM Ericsson

Date: _11-26-19_                    By: _____

                                      Cheryl J. Scarboro
                                      Joshua A. Levine
                                      Diana C. Wielocha
                                      Simpson Thacher & Bartlett LLP
                                      Counsel for Telefonaktiebolaget LM Ericsson

**FOR THE DEPARTMENT OF JUSTICE:**

                                    ROBERT A. ZINK
                                    Chief, Fraud Section
                                    Criminal Division
                                    United States Department of Justice

Date: _11/26/19_                    BY: _____

                                    Andrew Gentin
                                    Acting Assistant Chief
                                    Michael Culhane Harper
                                    Trial Attorney

                                    GEOFFREY S. BERMAN
                                    United States Attorney
                                    Southern District of New York

Date: _11/27/19_                    BY: _____

                                    David Abramowicz
                                    Assistant United States Attorney

                                   BY: _____

                                    Audrey Strauss
                                    Deputy U.S. Attorney

23

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Telefonaktiebolaget LM Ericsson (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Senior Vice President and Chief Legal Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: Nov 26, 2019

Telefonaktiebolaget LM Ericsson

By: _____

Xavier Dedullen
Senior Vice President
Chief Legal Officer

24

## CERTIFICATE OF COUNSEL

I am counsel for Telefonaktiebolaget LM Ericsson (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Senior Vice President and Chief Legal Officer and Chief Compliance Officer of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _11-26-19_

By: _____
Cheryl J. Scarboro
Simpson Thacher & Bartlett LLP
Counsel for Telefonaktiebolaget LM Ericsson

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's

Office for the Southern District of New York (the "Office") (collectively, the "United States"),

and the defendant Telefonaktiebolaget LM Ericsson ("LM Ericsson" or the "Company"). LM

Ericsson admits, accepts, and acknowledges that it is responsible for the acts of its officers,

directors, employees, and agents as set forth below. Should the Fraud Section and the Office

pursue the prosecution that is deferred by this Agreement, LM Ericsson agrees that it will neither

contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The

following facts took place during the relevant time frame and establish beyond a reasonable

doubt the charges set forth in the Criminal Information attached to this agreement.

**LM Ericsson and Other Relevant Entities and Individuals**

1.      From in or about and between 2000 and 2016 (the "relevant time period"),

LM Ericsson was a multinational telecommunications equipment and service company

headquartered in Stockholm, Sweden. LM Ericsson maintained a class of securities registered

pursuant to Section 12(b) of the Securities Exchange Act of 1934 and was required to file

periodic reports with the SEC. Accordingly, during the relevant time period, LM Ericsson was

an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United

States Code, Section 78dd-1. LM Ericsson was a holding company operating worldwide through

its subsidiaries and affiliated entities. The subsidiaries acted as divisions of the parent, rather

than separate and independent entities.  LM Ericsson and its subsidiaries, combined, have approximately 100,000 employees.

2.      During the relevant time period, Ericsson Egypt Ltd. ("Ericsson Egypt") was a majority-owned subsidiary and operating entity of LM Ericsson.  Individual employees of Ericsson Egypt oversaw Ericsson's operations in North East Africa, a region that included the country of Djibouti.  Ericsson Egypt's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

3.      During the relevant time period, Ericsson AB was a wholly-owned subsidiary of LM Ericsson that served as one of LM Ericsson's largest operating companies. Ericsson AB's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

4.      During the relevant time period, LM Ericsson operated in China through its direct and indirect wholly owned subsidiaries, including Ericsson (China) Company Ltd. ("ETC"), Ericsson (China) Communications Co., Ltd. ("CBC"), and Ericsson Hong Kong ("EHK"), as well as LM Ericsson's indirect majority-owned joint venture, Nanjing Ericsson Panda Communications Company Ltd. ("ENC") (ETC, CBC, EHK, and ENC are hereinafter collectively referred to as "Ericsson China").  Ericsson China's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

5.      During the relevant time period, Ericsson Vietnam Company Ltd. ("Ericsson Vietnam"), was a wholly-owned subsidiary of LM Ericsson that operated in Vietnam. Ericsson Vietnam's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

6.     During the relevant time period, PT Ericsson Indonesia ("Ericsson Indonesia"), was a majority-owned subsidiary of LM Ericsson that operated in Indonesia. Ericsson Indonesia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

7.     During the relevant time period, Ericsson Resource & Competence Center Sdn. Bhd. ("Ericsson Malaysia"), was a wholly-owned subsidiary of LM Ericsson that operated in Malaysia. Ericsson Malaysia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

8.     "Employee 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson. In or about and between May 2010 and June 2012, Employee 1 was the Head of the Customer Unit in North East Africa ("CU NEA"), a region that included Djibouti. Employee 1 left the Company in 2013. Employee 1 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.     "Employee 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson Egypt and acted as an agent of LM Ericsson. In or about and between November 2010 and October 2012, Employee 2 served as the VP of New Business Development for the Horn of Africa, a region that included Djibouti. Employee 2 reported to Employee 1. Employee 2 left the Company in 2015. Employee 2 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     "Employee 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between April 2010 and June 2014, Employee 3 was a high-level executive in the Middle East and Africa region, a region which included Djibouti and Kuwait.  Employee 1 reported to Employee 3.  Employee 3 left the Company in 2017.  Employee 3 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11.     "Employee 4," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between July 2011 and December 2012, while on a long term assignment with Ericsson Egypt, Employee 4 served as the Customer Unit Controller for North East Africa, including Djibouti.  Employee 4 reported to Employee 3.  Employee 4 left the Company in 2015.  Employee 4 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.     "Employee 5," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2004 and 2016, Employee 5 was a high-level executive in the Asia Pacific Region, a region which included China, Indonesia, and Vietnam.  Employee 5 left the Company in 2016. Employee 5 was an employee and agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "Employee 6," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of

LM Ericsson.  In or about and between 2008 and 2014, Employee 6 was a high-level executive in China.  Employee 6 reported to Employee 5.  Employee 6 left the Company in 2016. Employee 6 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

14.     "Employee 7," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2012 and 2016, Employee 7 was a high-level executive in China and Hong Kong. Employee 7 reported to Employee 5.  Employee 7 left the Company in 2018.  Employee 7 was an employee and an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15.     "Employee 8," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2016, Employee 8 was a high-level executive in China.  Employee 8 reported to Employee 5.  Employee 8 left the Company in 2018. Employee 8 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

16.     "Employee 9," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2004 and 2013, Employee 9 was a high-level executive in China and Hong Kong.  Employee 9 reported to Employee 5.  Employee 9 left the Company in 2016.  Employee 9 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

A-5

17.     "Employee 10," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2017, Employee 10 served as a Customer Unit Head of Vietnam.  Employee 10 left the Company in 2018.  Employee 10 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18.     "Employee 11," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB.  In or about and between 2011 and 2014, Employee 11 was the Customer Unit Head for Telecom Company C, which is defined below.  Employee 11 reported to Employee 3.  Employee 11 left the Company in 2018.  Employee 11 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

## Foreign Entities and Officials

19.     During the relevant time period, "Telecom Company A," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Djibouti.  Telecom Company A was controlled by the Djibouti government and performed a function that the Djibouti government treated as its own.  Telecom Company A was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

20.     During the relevant time period, "Telecom Company B," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in China.  Telecom Company B was controlled by the China government and performed a function that the China government treated as its own.  Telecom

Company B was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

21.     During the relevant time period, "Telecom Company C," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Kuwait.  Telecom Company C was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

22.     During the relevant time period, "Foreign Official 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 1 had influence over decisions made by Telecom Company A.  Foreign Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

23.     During the relevant time period, "Foreign Official 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 2 used his influence with the government of Djibouti to affect and influence the acts and decisions of Telecom Company A.  Foreign Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

24.     During the relevant time period, "Foreign Official 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was the CEO of Telecom Company A.  Foreign Official 3 had influence over decisions made by Telecom Company A.

Foreign Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United
States Code, Section 78dd-1(f)(1)(A).

### Third Party Agents and Consultants

25.     During the relevant time period, "Consulting Company A," an entity
whose identity is known to the Fraud Section, the Office, and the Company, was a private
consulting company that was formed in Djibouti.  Consulting Company A was registered to the
spouse of Foreign Official 2, and Foreign Official 2 acted as a representative of Consulting
Company A.

26.     During the relevant time period, "Consulting Company B," an entity
whose identity is known to the Fraud Section, the Office, and the Company, was a private
consulting company formed in Thailand.  Consulting Company B entered into consultancy
agreements with Ericsson Malaysia and Ericsson Vietnam.  Consulting Company B was retained
to assist Ericsson Vietnam in obtaining business in Vietnam.

27.     During the relevant time period, "Consulting Company C," an entity
whose identity is known to the Fraud Section, the Office, and the Company, was a private
consulting company formed in Indonesia and Singapore.  Consulting Company C entered into
consultancy agreements with Ericsson Malaysia and Ericsson Indonesia.  Consulting Company C
was retained to assist Ericsson Indonesia in obtaining business in Indonesia.

28.     During the relevant time period, "Consulting Company D," an entity
whose identity is known to the Fraud Section, the Office, and the Company, was a private
consulting company formed in Qatar.  Consulting Company D entered into a consultancy

contract with Ericsson AB's branch office in Qatar.  Consulting Company D was hired to help
Ericsson AB's branch office in Qatar obtain business with Telecom Company C in Kuwait.

29.     During the relevant time period, "Sales Agent 1," an individual whose
identity is known to the Fraud Section, the Office, and the Company, was a sales agent for
Ericsson China.  Sales Agent 1 had consulting companies that entered into service provider
agreements with Ericsson China.  Sales Agent 1 helped Ericsson China obtain business from
state-owned customers in China, including from Telecom Company B.

30.     During the relevant time period, "Sales Agent 2," an individual whose
identity is known to the Fraud Section, the Office, and the Company, was a sales agent for
Ericsson China.  Sales Agent 2 helped Ericsson China obtain business from state-owned
customers in China, including with Telecom Company B.

31.     During the relevant time period, "Sales Agent 3," an individual whose
identity is known to the Fraud Section, the Office, and the Company, was a sales agent for
Ericsson China.  Sales Agent 3 had multiple consulting companies that entered into service
provider agreements with Ericsson China.  Sales Agent 3 helped Ericsson China obtain business
from state-owned customers in China, including from Telecom Company B.

32.     During the relevant time period, "Sales Agent 4," an individual whose
identity is known to the Fraud Section, the Office, and the Company, was a sales agent for
Ericsson Vietnam.  Sales Agent 4 owned Consulting Company B.  Sales Agent 4 was retained to
help Ericsson Vietnam obtain business in Vietnam.

33.     During the relevant time period, "Sales Agent 5," an individual whose
identity is known to the Fraud Section, the Office, and the Company, was a consultant to

A-9

Ericsson AB's branch office in Qatar. Sales Agent 5 was a director of Consulting Company D. Sales Agent 5 helped Ericsson AB's branch office in Qatar obtain business with a state-owned customer in Kuwait.

**The Unlawful Schemes**

**Overview of the Djibouti Bribery Scheme**

34.    In or about and between 2010 and 2014, LM Ericsson, through certain of its agents, including Ericsson Egypt, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others knowingly and willfully conspired and agreed with others to corruptly provide approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, in order to secure an improper advantage in order to obtain and retain business with Telecom Company A and to win a contract valued at approximately €20,300,000 with Telecom Company A (the "Telecom Company A Contract").

35.    In order to conceal the true nature of the approximately $2,100,000 in bribe payments, Employee 2 completed a draft due diligence report that failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2. Further, certain agents of LM Ericsson caused Ericsson AB's branch office in Ethiopia to enter into a sham contract with Consulting Company A and to approve fake invoices in order to further conceal the bribe payments.

36.    LM Ericsson, through certain of its agents, caused the bribe payments to be improperly recorded in its consolidated books and records.

A-10

37.     In furtherance of the scheme, conspirators, including Employee 2 and Foreign Official 2, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

38.     In addition, the $2,100,000 in bribe payments that LM Ericsson, through certain of its agents, including Ericsson AB, Ericsson Egypt, and an employee of Ericsson Egypt, made and caused to be made to Consulting Company A were routed into and out of correspondent bank accounts at financial institutions in New York, New York.

### Details of the Djibouti Bribery Scheme

39.     Specifically, in or about May 2010, Telecom Company A informed Ericsson AB that Telecom Company A was planning to modernize the mobile networks system in Djibouti, and that Ericsson AB was selected to participate in a tender for the business.

40.     Subsequently, in or about 2010, Employee 2 informed Employee 1 that Ericsson AB could win the Telecom Company A Contract if Ericsson AB paid bribes to government officials in Djibouti.

41.     Subsequently, in or about 2010, Employee 1 and Employee 2 travelled to Djibouti to meet with Foreign Official 2 and Foreign Official 3.  During this trip, Foreign Official 2 informed Employee 1 that Foreign Official 1 needed to be paid a bribe of €1,000,000, a portion of which would be passed along to Foreign Official 3.  In return, Ericsson AB could win the Telecom Company A Contract.

42.     After the trip to Djibouti, in or about July 2010, Employee 1 informed Employee 3 that Ericsson AB could win the Telecom Company A Contract if it paid bribes to

Djibouti government officials. Employee 3 instructed Employee 1 to ensure that the bribe payments were tied to other costs associated with the Telecom Company A Contract.

43.     On or about October 25, 2010, Ericsson AB responded to the tender and submitted its bid to Telecom Company A.

44.     On or about May 11, 2011, Telecom Company A awarded the Telecom Company A Contract to Ericsson AB, a contract valued at approximately €20,300,000.

45.     On or about June 16, 2011, Ericsson AB's branch office in Ethiopia and Consulting Company A signed a consulting agreement. The services contemplated in the contract were never intended to be performed.

46.     On or about June 26, 2011, Foreign Official 2 sent Employee 2 an invoice from Consulting Company A requesting payment of €1,000,000 for 5,000 hours of purported work that was never performed.

47.     On July 24, 2011, Employee 2 sent Employee 1 an email stating, "[Foreign Official 3] is on vacation until the 28th of July so not much will happen before he gets back… Maybe it will be better to pay the 1 M to [Foreign Official 1] and [another foreign official] so things can be pushed from them. What do you think?" Employee 1 responded on or about July 26, 2011, "We need to book the contract before doing any $."

48.     Following additional delays in getting the bribe payment of €1,000,000 approved, Employee 1 sent a series of emails detailing the pressure Employee 1 was receiving from Djibouti government officials for the bribe payments to be made.

49.     On or about August 14, 2011, Employee 1 emailed Employee 4, "I got a call from [Foreign Official 2] and he wants to know when we will wire…"

A-12

50.     On August 14, 2011, Employee 1 emailed Employee 2 and Employee 4, and others, "Gents I just got another call from [Foreign Official 2]. We need to wire the payment within the current week."

51.     On or about August 17, 2011, Employee 1 emailed Employee 4 and others, "I just got now a call from the cabinet of [Foreign Official 1]. I really need we to wire the $."

52.     On or about August 18, 2011, Employee 1 emailed Employee 4 and others, attaching an invoice from Consulting Company A requesting the payment of €1,000,000, writing, "Hi, please find attached the invoice signed by me. Tell me what can I do to make this happen fast. I am getting strong pressures from [Foreign Official 1]. This is not nice."

53.     On or about August 18, 2011, Employee 2 emailed Employee 1 and Employee 4, and others, "As you said on your email below we have to pay the invoice ASAP . . . Everybody in the management of [Telecom Company A] & in the ministry are waiting their part of the cake."

54.     On or about August 22, 2011, Employee 2 emailed Employee 1, Employee 4, and others, attaching a draft due diligence report on Consulting Company A. The draft due diligence report failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2.

55.     On or about August 24, 2011, Ericsson AB's branch office in Dubai transferred approximately $1,441,050 – the approximate equivalent at the time of €1,000,000 – to Consulting Company A. Bank records show that the funds were wired through correspondent

bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

56.     On or about August 29, 2011, Employee 2 emailed Employee 4 a second invoice from Consulting Company A, requesting a payment of €122,000 for 610 hours of purported work that was never performed.

57.     On or about October 27, 2011, Ericsson AB's branch office in Dubai transferred approximately $171,703 – the approximate equivalent at the time of €122,000 – to Consulting Company A.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

58.     On or about January 27, 2012, Employee 2 sent Employee 4 a third invoice from Consulting Company A, requesting a payment of €414,000 for 2,070 hours of purported work that was never performed.

59.     On or about March 9, 2012, Ericsson AB's branch office in Dubai transferred approximately $545,230 – the approximate equivalent at the time of €414,000 – to Consulting Company A.  Bank records show that the funds were through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

60.     On or about June 30, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

A-14

61.     On or about December 28, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

62.     Ericsson AB continued to perform on the Telecom Company A contract through 2014.

63.     In or about January 2014, Ericsson AB sent an invoice to Telecom Company A in order to receive the final payment under the Telecom Company A contract.

64.     On or about January 31, 2014, Ericsson AB received its last payment for its performance on the Telecom Company A contract.  LM Ericsson, through Ericsson AB, earned approximately $7,000,000 in profits from the Telecom Company A Contract.

### Overview of the Scheme in China

65.     In or about and between at least 2000 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, EHK, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, caused tens of millions of dollars to be paid to various agents, consultants, and service providers in China, at least a portion of which was used to provide things of value, including leisure travel and entertainment, to foreign officials, including employees of Telecom Company B.

66.     Additionally, in or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, made payments to third party service providers pursuant to sham contracts for services that were never performed. The purpose of these

A-15

payments was to allow Ericsson China to continue to use and pay third party agents in China in contravention of Ericsson's policies and procedures. LM Ericsson, through certain of its employees and agents, knowingly mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated books and records.

**Details of the Payments in China Pursuant to Sham Service Provider Agreements**

67.     In or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including Ericsson China, made approximately $31,500,000 in payments pursuant to sham service provider agreements under which no legitimate services were rendered. These payments were made so as to continue to use and pay third party agents in China in contravention of LM Ericsson's policies and procedures.

68.     Specifically, in or about 2011, LM Ericsson instructed senior executives, including Employee 5, that all sales agent agreements needed to be terminated. In or about 2013, LM Ericsson formalized this policy change to prohibit the use of third party agents, except in cases where legally required or necessary for a specific business reason (the "New Agent Policy").

69.     In spite of this, Employee 5 determined that it was important for LM Ericsson's business in China to continue to engage third party agents that had strong connections to LM Ericsson's state-owned customers.

70.     Employee 5 instructed Employee 6 to work with others, including Employee 7, to create a structure that would allow Ericsson China to continue to work with and pay third party agents despite the New Agent Policy.

71.     Employee 6 and Employee 7, with the knowledge, assistance, and direction of Employee 5, caused ENC to enter into False Service Agreements (the "False Service Agreements") and to sign purchase requests and approve invoices with pre-existing approved service providers, including consulting companies associated with Sales Agent 1 and Sales Agent 3. The services contemplated in the False Service Agreements, purchase requests, and invoices were never intended to be provided. Further, the False Service Agreements were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy. For example,

a.     On or about January 1, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 3.

b.     On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

72.     In or around 2015, Employee 5 instructed Employee 8 to work with others to create a new and more complicated structure of agreements with third party providers to enable Ericsson China to continue working with and paying third party agents in violation of the New Agent Policy.

73.     In or around 2015, Employee 8, and others, with the knowledge, assistance, and direction of Employee 5, caused CBC to enter into False Service Development

A-17

Agreements (the "False Service Development Agreements") and to sign purchase requests and approve invoices with newly established third party service provider companies, all of which were associated with pre-existing agents, specifically Sales Agent 1 and Sales Agent 3. The services contemplated in the False Service Development Agreements, purchase requests, and invoices were never intended to be provided. Further, the False Service Development Agreements, were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy.

74.     Certain employees and agents of LM Ericsson knowingly caused the payments related to False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records. For example,

a.     On or about July 11, 2014, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $879,955.22 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

b.     On or about July 27, 2013, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,059,999.98 to a consulting company associated with Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

c.     On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

A-18

d.      On or about January 14, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $427,902.46 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

e.      On or about April 20, 2015, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, and Employee 8 caused CBC to enter into a False Service Development Agreement with a consulting company associated with Sales Agent 3.

f.      On or about September 1, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,301,765.16 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

g.      On or about September 3, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,135,700.06 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

h.      On or about September 12, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $764,419.45 to a consulting company associated Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

**Details of the Agent Payments in China to Cover Expenditures for Gifts, Travel, and Entertainment**

75.     Since at least in or about the early 1990s, LM Ericsson, through certain of its employees and agents, including ENC, CBC, and EHK, had an expense account (the "Travel Expense Account") that covered expenses on behalf of agents and customers in China, including gifts, travel, and entertainment for customers from state-owned telecommunications companies, that had no legitimate business purpose. The Travel Expense Account was largely associated with Sales Agent 2 and was used to pay for gifts, travel, and entertainment for Ericsson's state-owned customers in China, including Telecom Company B, as well as to cover Sales Agent 2's own travel expenses. Certain employees of LM Ericsson and Ericsson China used the Travel Expense Account to win business with state-owned customers, including Telecom Company B. The total historical spend through the Travel Expense Account was tens of millions of dollars.

76.     The Travel Expense Account covered travel for delegations of Chinese government officials and sales and procurement managers of state-owned customers, including Telecom Company B, on trips to international destinations, including to the United States, which had little to no apparent business purpose. The trips include, among others:

a.     In or around and between April 2007 and May 2007, Ericsson China paid for a delegation of Chinese government officials and high-level employees of Telecom Company B to go on a 16-day trip to Canada, the United States, and the Caribbean, including a week-long luxury cruise that included ports of call in Barbados, St. Lucia, Antigua, and St. Martin. Only two hours of the 16-day trip were reserved for meetings at Ericsson's offices in Canada.

   b.  In or around May 2013, Ericsson China paid for a delegation of Chinese government officials to go on a trip to the United States and the United Kingdom, with stops in Palo Alto, CA (with accommodations at the Four Seasons Hotel), Las Vegas, NV, Phoenix, AZ, Chicago, IL, and London, England.

   77.  In or around 2008, in an effort to conceal the continued existence of the Travel Expense Account from LM Ericsson's headquarters, Employee 5, Employee 6, and others, came to an arrangement with a consulting company of Sales Agent 1 for Sales Agent 1 to cover the expenses associated with the Travel Expense Account, and then to seek reimbursement for the associated expenses from EHK.  EHK also provided Letters of Guarantee to certain vendors, including a luxury hotel and a travel agency, associated with the Travel Expense Account in order to guarantee that EHK would be responsible for any expenses that Sales Agent 1 failed to cover.

   78.  In or around 2013, in light of the New Agent Policy, and to further conceal the Travel Expense Account, Employee 5 instructed Employee 6 and Employee 7 to continue to have Sales Agent 1 cover the expenses associated with the Travel Expense Account, but to reimburse Sales Agent 1 through the False Service Agreements and the False Service Development Agreements.

   79.  In or about and between 2013 and 2015, LM Ericsson, through certain of its employees and agents, including ENC, CBC, EHK, Employee 5, Employee 6, Employee 7, Employee 8, and others paid approximately $19,500,000 to cover the expenses associated with the Travel Expense Account.  Most of these expenditures related to travel for Chinese government officials and employees of state-owned customers, including Telecom Company B,

which had no apparent business purpose, including the previously described customer trip to the United States in 2013.

80.     Employee 5, Employee 6, Employee 7, Employee 8, and others knowingly caused CBC to sign purchase requests and approve invoices submitted by third party service providers pursuant to the False Service Agreements and False Service Development Agreements for services that were never provided.  The true purpose of the false purchase requests was to cover the expenses associated with the Travel Expense Account.  These fake purchase requests and false invoices were used to justify making the payments to third party service providers.

81.     Certain employees and agents of LM Ericsson knowingly caused payments related to the False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records.

### The Scheme in Vietnam

82.     In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Malaysia, Ericsson Vietnam, Employee 9, and Employee 10, made approximately $4,800,000 in payments, sometimes in cash, to Consulting Company B in order to create off-the-books slush funds to be managed by Sales Agent 4 (a representative of Consulting Company B) and Consulting Company B, with oversight and direction from employees and agents of LM Ericsson's subsidiaries Ericsson Malaysia and Ericsson Vietnam, and Employee 9.

83.     The slush fund accounts were sometimes used to make payments to other third parties who Ericsson employees knew would not be able to pass Ericsson's due diligence processes.

A-22

84.    The payments to Consulting Company B were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Vietnam, and Consulting Company B for services that were never performed.  For example,

a.    In or about July 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Vietnam, Employee 9, and Employee 10, caused Ericsson Vietnam to enter into a sham consultancy agreement with Consulting Company B.

85.    Sales Agent 4 also set up a means by which Sales Agent 4 could quickly transfer cash to third parties.

86.    For example, in January 2014 Employee 9 and Sales Agent 4 discussed via email the need to urgently transfer $25,000 to provide to an individual in Hanoi.  On or about January 21, 2014, an employee of LM Ericsson, known to the Fraud Section, the Office, and the Company, sent Employee 9 and Employee 10 an email with the subject "Update summary [Employee 10]" and the following content: "Hi [Employee 9], Please find a summary of the transfers, Q 64,953 . . . F&S 108,600 . . . Dr 108,600 . . . Taiwan 154,000 . . Thao 208,700." "DR", "Thao", and "F&S" were identified as sub-agents associated with LM Ericsson's customers in Vietnam, all of which were state-owned.

87.    Employee 10 understood that the slush funds managed by Sales Agent 4 were associated with LM Ericsson's customers in Vietnam.  A portion of the slush funds managed by Sales Agent 4 were given to customers as cash gifts.

88.    LM Ericsson, through certain of its employees and agents, knowingly mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated books and records.  Some of these payments were improperly recorded as "[Consulting

Company B] Supply Cost HQM" to an "External HW, Material Consumption" account. For example,

        a.      On or about December 19, 2012, LM Ericsson, through certain of its agents, caused LM Ericsson to improperly record the payment of approximately $433,604 to Consulting Company B in LM Ericsson's consolidated books and records.

### The Scheme in Indonesia

        89.     In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, made approximately $45,000,000 in payments to Consulting Company C in order to create off-the-books slush funds to be managed by Consulting Company C, with oversight and direction from employees and agents of LM Ericsson and its subsidiaries, including Ericsson Indonesia, Employee 5, and Employee 9. LM Ericsson, through its agents and employees, took active steps to conceal these payments on Ericsson's books and records.

        90.     The payments to Consulting Company C were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Indonesia, and Consulting Company C for services that were never performed. For example,

        a.      In or about January 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, caused Ericsson Indonesia to enter into a sham consulting agreement with Consulting Company C.

        91.     Toward the end of the scheme, Ericsson made termination payments to Consulting Company C but improperly recorded these payments in a "Customer Service" account connected with a "Cost of Sales" account.

92.     For example, on or about August 7, 2014, a representative of Consulting

Company C, whose identity is known to the Fraud Section, the Office, and the Company, sent an

email to Employee 9: "[Employee 9], Please see my updated files, attached, which show the

current net balance as follows: Entitlements vs. Settlements = $3,625,734 . . Fridge =

($2,374,259) . . . [Other] = ($1,270,899) . . . Operational = ($634,783) . . . Net total =

($654,207)." Ericsson Indonesia, Employee 9, and others, knew that the "Fridge" account was a

cash account that was used for "off the book" expenses, such as pleasure travel to Bali, that

certain employees of the Company did not want to record on the Company's books.

93.     LM Ericsson, through certain of its employees and agents, knowingly

mischaracterized the above-described payments and improperly recorded them in LM Ericsson's

consolidated books and records. For example,

a.      On or about April 30, 2014, LM Ericsson, through certain of its

employees and agents, caused the payment of approximately $1,329,162 to Consulting Company

C to be improperly recorded in LM Ericsson's consolidated books and records.

94.     Some documents suggest a link between the "Fridge" account and the

Company's customers in Indonesia, some of which were state-owned.

### The Scheme in Kuwait

95.     In or about and between 2011 and 2013, LM Ericsson, through certain of

its agents, including Ericsson AB, Employee 3, and Employee 11, made a payment of

approximately $450,000 to Consulting Company D, at the request of Sales Agent 5, a

representative of Consulting Company D. The payment was not made in compliance with LM

Ericsson's internal accounting controls.

A-25

96.     In order to conceal the payment to Consulting Company D, agents of LM Ericsson entered into a sham contract with Consulting Company D and approved a fake invoice for services that were never performed in order to paper over the payment.

97.     Specifically, in or around October 2011, Telecom Company C opened a tender for the modernization of Telecom Company C's radio access network in Kuwait.  In response to the tender, Ericsson AB submitted a bid for the project.

98.     In or around October 2011, Employee 11 was in contact with Sales Agent 5. Sales Agent 5 provided Employee 11 with inside information, including competitor information, about the Telecom Company C tender.  During this time period, Sales Agent 5 and Consulting Company D did not have any formal agreement with LM Ericsson or Ericsson AB.

99.     On or about December 31, 2012, Telecom Company C awarded the tender to Ericsson AB, a contract valued at approximately $182,442,430.

100.    On or about January 28, 2013, Sales Agent 5 sent a text message to Employee 11, "I have told you in the past many times and I will tell you again that will not put you under pressure or ask you to do impossible things [or] have a fight or an argument with you I have a commitment to my friends in Kuwait which I need to fulfil[l] And will not pay it From pocket. I need you to find a way out for us and quickly."

101.    On or about November 6, 2013, Sales Agent 5 sent an email to Employee 3, "[Employee 11] was told that I have personally paid my friends in Kuwait the amount of 315000 Dollars and in the process we are not friends any more. . . . [Employee 11] said he will come back with an offer the next day.  Two day later he called and made an offer to settle this matter for a payment of 400 k."

A-26

102.    On or about December 12, 2013, an Ericsson employee sent an email attaching a draft "Consultancy Frame Agreement" between Consulting Company D and Ericsson AB's branch office in Qatar.  In the email, the employee wrote, "I have been asked to sort out the mess we got into in Kuwait. . . .  I have constructed the attached agreement. . . . I do not want anyone to think that I had anything to do with this just because I am now cleaning it up!"

103.    In or about December 2013, Consulting Company D and Ericsson AB's branch office in Qatar entered into a Consultancy Frame Agreement dated December 10, 2013 (the "Consultancy Frame Agreement").  The agreement stated that Ericsson AB's branch office in Qatar engaged Consulting Company D to supply consulting services "within the area of marketing and sales support to increase customer satisfaction and enhance Ericsson business in Kuwait from the 1st of January 2010 to 31st of December 2012 with the purpose of winning the LTE business with [Telecom Company C]."  These services were never provided.

104.    The agreement also provided that it replaced a "previously signed agreement between the two parties which, due to reasons beyond the control of both parties, has been lost."  This was false.  There was no previously signed agreement.

105.    On or about December 22, 2013, Consulting Company D issued an invoice to Ericsson AB requesting a payment of $450,000 pursuant to the Consultancy Frame Agreement.  The invoice called for payment on services that were never performed.

106.    In or around December 2013, Ericsson AB's branch office in Qatar transferred approximately $450,000 to Consulting Company D.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company D's bank account at a bank in Qatar.

107.    In or around 2013, LM Ericsson, through certain of its agents, caused the
$450,000 payment to Consulting Company D to be improperly recorded in LM Ericsson's
consolidated books and records.

### LM Ericsson's Willful Failure to Implement and Maintain Sufficient Internal Accounting Controls

108.    During the relevant time period, LM Ericsson, through certain of its
employees and agents, knowingly and willfully failed to implement and maintain sufficient
internal accounting controls, which facilitated the payment of bribes.

109.    Specifically, certain employees of LM Ericsson, Ericsson AB, and
subsidiaries thereof, including Employee 3, Employee 4, Employee 5, Employee 6, and
Employee 7, who were responsible for implementing and overseeing a system of reasonable
internal accounting controls, were made aware of significant control weaknesses, including
actions taken by employees and high-level executives to make improper payments to third party
agents, yet knowingly and willfully failed to implement sufficient controls, which facilitated the
payment of bribes.

110.    For example, with respect to the conduct in Djibouti, Employee 3,
Employee 4, and others, who were in a position to oversee and implement LM Ericsson's
internal accounting controls, knew that the Company's internal accounting controls were
insufficient to identify that the third party consultant in Djibouti was engaged in bribery, was
being paid pursuant to fake invoices, was being paid pursuant to a sham contract, and was being
paid despite not performing the services described in the invoices, and Employee 3, Employee 4,
and others willfully failed to implement sufficient accounting controls to prevent transactions

from being improperly executed, and to prevent the Company's assets from being misused, in order to continue the bribery scheme.

111.    With respect to the conduct in Kuwait, Employee 3 and others, who were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that a third party consultant in Kuwait was being paid pursuant to a fake invoice, was being paid pursuant to a sham contract, and was being paid despite not performing the services described in the invoice, and Employee 3 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

112.    With respect to the conduct in China, Employee 5, Employee 6, Employee 7, and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in China were engaged in providing gifts, travel, and entertainment to employees of state-owned customers, were being paid pursuant to fake invoices, were being paid pursuant to sham contracts, and were being paid despite not performing the services described in the invoices, and Employee 5, Employee 6, Employee 7, and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and the Company's assets from being misused, in order to continue the improper payments.

113.    With respect to the conduct in Vietnam and Indonesia, Employee 5 and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in those countries were being paid pursuant to fake invoices in order to manage off-

A-29

the-books slush funds, were being paid pursuant to sham contracts, were being paid despite not performing the services described in the invoices, and Employee 5 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

114. In sum, despite the fact that high-level executives at LM Ericsson knew that the internal accounting controls were inadequate, LM Ericsson, as a result of the conduct of certain of its agents, employees, and high-level executives, nevertheless knowingly and willfully failed to implement sufficient controls, which facilitated the payment of bribes.

115. The failures to implement internal accounting controls included, but were not limited to, controls relating to: (a) proper documentation and accounting for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) due diligence for the retention of third party agents and consultants; (c) ensuring due diligence was completed and a fully executed contract was entered with a third party before the third party could begin providing services; (d) ensuring that payments were commensurate with the services to be performed by third parties and that the services paid for were performed; and (e) oversight procedures by personnel at LM Ericsson for third party retention and payment.

### LM Ericsson's Falsified Books and Records

116. As a result of LM Ericsson's failure to implement effective internal accounting controls, LM Ericsson, through certain of its employees and agents, disguised in its books and records the $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti. LM Ericsson, through certain of its employees and agents, also failed to properly record approximately $51,500,000 in payments to third party service providers in China, a subset

of which was used to fund gifts, travel, and entertainment for Chinese foreign officials; the $4,800,000 in payments to a consultant in Vietnam; the $45,000,000 in payments to a consultant in Indonesia, and the $450,000 payment to a consultant in Kuwait.

117.    In connection with these payments, LM Ericsson, through certain of its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered.  The payments were falsely or misleadingly characterized in LM Ericsson's books and records, including as consulting expenses, costs of sale, "external hardware" expenses, "corporate marketing fees," "service fulfillment of contract," or administrative or research and development costs.

118.    With respect to the conduct described above regarding China, approximately $51,500,000 in payments to third party service providers were inaccurately recorded in LM Ericsson's consolidated books and records.

119.    With respect to the conduct described above regarding Vietnam, approximately $4,800,000 in payments to Consulting Company B were inaccurately recorded in LM Ericsson's consolidated books and records.

120.    With respect to the conduct described above regarding Indonesia, approximately $45,000,000 in payments to Consulting Company C were inaccurately recorded in LM Ericsson's consolidated books and records.

121.    With respect to the conduct described above regarding Kuwait, the payment on or about December 30, 2013 of approximately $450,000 to Consulting Company D was inaccurately recorded in LM Ericsson's consolidated books and records.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Telefonaktiebolaget LM Ericsson (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the Office of the United States Attorney for the Southern District of New York (the "Office") (collectively, the "United States") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company and to accounting violations; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's Senior Vice President and Chief Legal Officer, Xavier Dedullen, together with outside counsel for the Company, has advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the two-count Information charging the Company with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1, and one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the books and records and internal controls provisions of the FCPA, Title 15, United States Code, Sections 78m(b)(2)(A),

78m(b)(2)(B), and 78m(b)(5); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and the Office; and (c) agrees to accept a monetary penalty against Company totaling $520,650,432, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts, or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      Each of the Senior Vice President and Chief Legal Officer of the Company, Xavier Dedullen, and Chief Compliance Officer, Laurie Waddy, are hereby individually authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Senior Vice President and Chief Legal Officer of the Company, Xavier Dedullen, Laurie Waddy, may approve;

4.      Each of the Senior Vice President and Chief Legal Officer of the Company, Xavier Dedullen, and Chief Compliance Officer, Laurie Waddy, are hereby individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Senior Vice President and Chief Legal Officer of Company, Xavier Dedullen, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _____                    By: _____
                                              Ronnie Leten
                                              Chair of the Board of Directors
                                              Telefonaktiebolaget LM Ericsson

B-3

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Telefonaktiebolaget LM Ericsson (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including, but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

        a.      gifts;

        b.      hospitality, entertainment, and expenses;

        c.      customer travel;

        d.      political contributions;

        e.      charitable donations and sponsorships;

      f.     facilitation payments; and

      g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system shall be designed to provide reasonable assurances that:

      a.     transactions are executed in accordance with management's general or specific authorization;

      b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

      c.     access to assets is permitted only in accordance with management's general or specific authorization; and

      d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the

Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.     The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.     The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding

certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance

code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to

compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.    The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.    The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.    train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.    where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.    The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption

code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Telefonaktiebolaget LM Ericsson (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of New York (the "Office") (collectively, the "United States"), are as described below:

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the

Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data privacy and national security laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data privacy and national security laws and regulations).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement, subject to applicable local laws, including data privacy and national security laws and regulations.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

*Withholding Access*

D-2

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the Company and Review Methodology*

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the initial report, after

D-4

consultation with the Company and the Fraud Section and the Office, the Monitor shall prepare the first written work plan within sixty calendar days of being retained, and the Company and the Fraud Section and the Office shall provide comments within thirty calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Fraud Section and the Office, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the Fraud Section and the Office shall provide comments within thirty calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than one hundred twenty calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section and the Office). The Monitor shall issue a written report within

one hundred eighty calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather should focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005, and to the Chief, Criminal Division, United States Attorney's Office for the Southern District of New York, 1 St. Andrew's Plaza, New York City, NY 10007. After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section and the Office.

13.     Within one hundred eighty calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty calendar days of receiving the report, the Company notifies in writing the Monitor and the Fraud Section and the Office of any recommendations that the Company considers unduly

burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred eighty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred eighty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than one hundred eighty calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Fraud Section and the Office). The Monitor shall issue a written follow-up report within one

hundred twenty calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review. After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.     Within one hundred twenty calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section and the Office concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.   As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company

shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

19. The Monitor shall undertake a second follow-up review not later than one hundred twenty calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within one hundred twenty days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18. No later than seventy-five days before the end of the Term, the Monitor shall submit to the Fraud Section and the Office a final written report ("Certification Report"), setting forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts. No later than seventy-five days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the FCPA or other applicable anti-corruption laws.

*Monitor's Discovery of Potential or Actual Misconduct*

20. (a) Except as set forth below in sub-paragraphs (b), (c), and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

D-9

●    the Company may have maintained false books, records or accounts; or

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and shall report Potential Misconduct to the Fraud Section and the Office when they request the information.

(b)    In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)    If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as only the Fraud Section and the Office and the Monitor deem appropriate under the circumstances.

(d)    The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously

disclosed to the Fraud Section and the Office or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and the Office and address the Company's failure to disclose the necessary information in his or her reports.

(e)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Monitorship*

21.     The Monitor shall meet with the Fraud Section and the Office within thirty calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section and the Office, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Fraud Section and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or

D-11

except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section's and the Office's discharge of their duties and responsibilities or is otherwise required by law.