## ATTACHMENT A-2

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Southern District of New York (the "Office") (collectively, the "United States"), and the defendant Telefonaktiebolaget LM Ericsson ("LM Ericsson" or the "Company"). LM Ericsson admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, LM Ericsson agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the Criminal Information attached to this agreement.

### LM Ericsson and Other Relevant Entities and Individuals

1. From in or about and between 2000 and 2016 (the "relevant time period"), LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden. LM Ericsson maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and was required to file periodic reports with the SEC. Accordingly, during the relevant time period, LM Ericsson was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1. LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities. The subsidiaries acted as divisions of the parent, rather than

separate and independent entities.    LM Ericsson and its subsidiaries, combined, have approximately 100,000 employees.

2.        During the relevant time period, Ericsson Egypt Ltd. ("Ericsson Egypt") was a majority-owned subsidiary and operating entity of LM Ericsson.  Individual employees of Ericsson Egypt oversaw Ericsson's operations in North East Africa, a region that included the country of Djibouti.  Ericsson Egypt's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

3.        During the relevant time period, Ericsson AB was a wholly-owned subsidiary of LM Ericsson that served as one of LM Ericsson's largest operating companies. Ericsson AB's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

4.        During the relevant time period, LM Ericsson operated in China through its direct and indirect wholly owned subsidiaries, including Ericsson (China) Company Ltd. ("ETC"), Ericsson (China) Communications Co., Ltd. ("CBC"), and Ericsson Hong Kong ("EHK"), as well as LM Ericsson's indirect majority-owned joint venture, Nanjing Ericsson Panda Communications Company Ltd. ("ENC") (ETC, CBC, EHK, and ENC are hereinafter collectively referred to as "Ericsson China").   Ericsson China's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

5.        During the relevant time period, Ericsson Vietnam Company Ltd. ("Ericsson Vietnam"), was a wholly-owned subsidiary of LM Ericsson that operated in Vietnam. Ericsson Vietnam's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

6.      During the relevant time period, PT Ericsson Indonesia ("Ericsson Indonesia"), was a majority-owned subsidiary of LM Ericsson that operated in Indonesia. Ericsson Indonesia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

7.      During the relevant time period, Ericsson Resource & Competence Center Sdn. Bhd. ("Ericsson Malaysia"), was a wholly-owned subsidiary of LM Ericsson that operated in Malaysia. Ericsson Malaysia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

8.      "Employee 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson. In or about and between May 2010 and June 2012, Employee 1 was the Head of the Customer Unit in North East Africa ("CU NEA"), a region that included Djibouti. Employee 1 left the Company in 2013. Employee 1 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      "Employee 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson Egypt and acted as an agent of LM Ericsson. In or about and between November 2010 and October 2012, Employee 2 served as the VP of New Business Development for the Horn of Africa, a region that included Djibouti. Employee 2 reported to Employee 1. Employee 2 left the Company in 2015. Employee 2 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     "Employee 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between April 2010 and June 2014, Employee 3 was a high-level executive in the Middle East and Africa region, a region which included Djibouti and Kuwait.  Employee 1 reported to Employee 3.  Employee 3 left the Company in 2017. Employee 3 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11.     "Employee 4," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between July 2011 and December 2012, while on a long term assignment with Ericsson Egypt, Employee 4 served as the Customer Unit Controller for North East Africa, including Djibouti.  Employee 4 reported to Employee 3. Employee 4 left the Company in 2015.  Employee 4 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.     "Employee 5," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2004 and 2016, Employee 5 was a high-level executive in the Asia Pacific Region, a region which included China, Indonesia, and Vietnam.  Employee 5 left the Company in 2016.  Employee 5 was an employee and agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "Employee 6," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM

Ericsson.  In or about and between 2008 and 2014, Employee 6 was a high-level executive in China.  Employee 6 reported to Employee 5.  Employee 6 left the Company in 2016.  Employee 6 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

14.     "Employee 7," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2012 and 2016, Employee 7 was a high-level executive in China and Hong Kong.  Employee 7 reported to Employee 5.  Employee 7 left the Company in 2018.  Employee 7 was an employee and an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15.     "Employee 8," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2016, Employee 8 was a high-level executive in China.  Employee 8 reported to Employee 5.  Employee 8 left the Company in 2018.  Employee 8 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

16.     "Employee 9," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2004 and 2013, Employee 9 was a high-level executive in China and Hong Kong.  Employee 9 reported to Employee 5.  Employee 9 left the Company in 2016.  Employee 9 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

17.    "Employee 10," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2017, Employee 10 served as a Customer Unit Head of Vietnam.  Employee 10 left the Company in 2018.  Employee 10 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18.    "Employee 11," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB.  In or about and between 2011 and 2014, Employee 11 was the Customer Unit Head for Telecom Company C, which is defined below.  Employee 11 reported to Employee 3.  Employee 11 left the Company in 2018.  Employee 11 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

### Foreign Entities and Officials

19.    During the relevant time period, "Telecom Company A," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Djibouti.  Telecom Company A was controlled by the Djibouti government and performed a function that the Djibouti government treated as its own.  Telecom Company A was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

20.    During the relevant time period, "Telecom Company B," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in China.  Telecom Company B was controlled by the China government and performed a function that the China government treated as its own.  Telecom

Company B was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

21.     During the relevant time period, "Telecom Company C," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Kuwait.  Telecom Company C was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

22.     During the relevant time period, "Foreign Official 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 1 had influence over decisions made by Telecom Company A.  Foreign Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

23.     During the relevant time period, "Foreign Official 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 2 used his influence with the government of Djibouti to affect and influence the acts and decisions of Telecom Company A.  Foreign Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

24.     During the relevant time period, "Foreign Official 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was the CEO of Telecom Company A.  Foreign Official 3 had influence over decisions made by Telecom Company A.

Foreign Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

### **Third Party Agents and Consultants**

25.     During the relevant time period, "Consulting Company A," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company that was formed in Djibouti.  Consulting Company A was registered to the spouse of Foreign Official 2, and Foreign Official 2 acted as a representative of Consulting Company A.

26.     During the relevant time period, "Consulting Company B," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Thailand.  Consulting Company B entered into consultancy agreements with Ericsson Malaysia and Ericsson Vietnam.  Consulting Company B was retained to assist Ericsson Vietnam in obtaining business in Vietnam.

27.     During the relevant time period, "Consulting Company C," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Indonesia and Singapore.  Consulting Company C entered into consultancy agreements with Ericsson Malaysia and Ericsson Indonesia.  Consulting Company C was retained to assist Ericsson Indonesia in obtaining business in Indonesia.

28.     During the relevant time period, "Consulting Company D," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Qatar.  Consulting Company D entered into a consultancy contract with Ericsson AB's branch office in Qatar.  Consulting Company D was hired to help Ericsson AB's branch office in Qatar obtain business with Telecom Company C in Kuwait.

29.     During the relevant time period, "Sales Agent 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.  Sales Agent 1 had consulting companies that entered into service provider agreements with Ericsson China.  Sales Agent 1 helped Ericsson China obtain business from state-owned customers in China, including from Telecom Company B.

30.     During the relevant time period, "Sales Agent 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.  Sales Agent 2 helped Ericsson China obtain business from state-owned customers in China, including with Telecom Company B.

31.      During the relevant time period, "Sales Agent 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.   Sales Agent 3 had multiple consulting companies that entered into service provider agreements with Ericsson China.  Sales Agent 3 helped Ericsson China obtain business from state-owned customers in China, including from Telecom Company B.

32.     During the relevant time period, "Sales Agent 4," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson Vietnam.  Sales Agent 4 owned Consulting Company B.  Sales Agent 4 was retained to help Ericsson Vietnam obtain business in Vietnam.

33.     During the relevant time period, "Sales Agent 5," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a consultant to Ericsson AB's branch office in Qatar.  Sales Agent 5 was a director of Consulting Company D.  Sales Agent

5 helped Ericsson AB's branch office in Qatar obtain business with a state-owned customer in Kuwait.

## The Unlawful Schemes

### Overview of the Djibouti Bribery Scheme

34.     In or about and between 2010 and 2014, LM Ericsson, through certain of its agents, including Ericsson Egypt, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others knowingly and willfully conspired and agreed with others to corruptly provide approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, in order to secure an improper advantage in order to obtain and retain business with Telecom Company A and to win a contract valued at approximately €20,300,000 with Telecom Company A (the "Telecom Company A Contract").

35.     In order to conceal the true nature of the approximately $2,100,000 in bribe payments, Employee 2 completed a draft due diligence report that failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2.  Further, certain agents of LM Ericsson caused Ericsson AB's branch office in Ethiopia to enter into a sham contract with Consulting Company A and to approve fake invoices in order to further conceal the bribe payments.

36.     LM Ericsson, through certain of its agents, caused the bribe payments to be improperly recorded in its consolidated books and records.

37.     In furtherance of the scheme, conspirators, including Employee 2 and Foreign Official 2, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

38.     In addition, the $2,100,000 in bribe payments that LM Ericsson, through certain of its agents, including Ericsson AB, Ericsson Egypt, and an employee of Ericsson Egypt, made and caused to be made to Consulting Company A were routed into and out of correspondent bank accounts at financial institutions in New York, New York.

## Details of the Djibouti Bribery Scheme

39.     Specifically, in or about May 2010, Telecom Company A informed Ericsson AB that Telecom Company A was planning to modernize the mobile networks system in Djibouti, and that Ericsson AB was selected to participate in a tender for the business.

40.     Subsequently, in or about 2010, Employee 2 informed Employee 1 that Ericsson AB could win the Telecom Company A Contract if Ericsson AB paid bribes to government officials in Djibouti.

41.     Subsequently, in or about 2010, Employee 1 and Employee 2 travelled to Djibouti to meet with Foreign Official 2 and Foreign Official 3.  During this trip, Foreign Official 2 informed Employee 1 that Foreign Official 1 needed to be paid a bribe of €1,000,000, a portion of which would be passed along to Foreign Official 3.  In return, Ericsson AB could win the Telecom Company A Contract.

42.     After the trip to Djibouti, in or about July 2010, Employee 1 informed Employee 3 that Ericsson AB could win the Telecom Company A Contract if it paid bribes to

Djibouti government officials.  Employee 3 instructed Employee 1 to ensure that the bribe payments were tied to other costs associated with the Telecom Company A Contract.

43.     On or about October 25, 2010, Ericsson AB responded to the tender and submitted its bid to Telecom Company A.

44.     On or about May 11, 2011, Telecom Company A awarded the Telecom Company A Contract to Ericsson AB, a contract valued at approximately €20,300,000.

45.     On or about June 16, 2011, Ericsson AB's branch office in Ethiopia and Consulting Company A signed a consulting agreement.  The services contemplated in the contract were never intended to be performed.

46.      On or about June 26, 2011, Foreign Official 2 sent Employee 2 an invoice from Consulting Company A requesting payment of €1,000,000 for 5,000 hours of purported work that was never performed.

47.     On July 24, 2011, Employee 2 sent Employee 1 an email stating, "[Foreign Official 3] is on vacation until the 28th of July so not much will happen before he gets back… Maybe it will be better to pay the 1 M to [Foreign Official 1] and [another foreign official] so things can be pushed from them. What do you think?"  Employee 1 responded on or about July 26, 2011, "We need to book the contract before doing any $."

48.     Following additional delays in getting the bribe payment of €1,000,000 approved, Employee 1 sent a series of emails detailing the pressure Employee 1 was receiving from Djibouti government officials for the bribe payments to be made.

49.     On or about August 14, 2011, Employee 1 emailed Employee 4, "I got a call from [Foreign Official 2] and he wants to know when we will wire…"

50.     On August 14, 2011, Employee 1 emailed Employee 2 and Employee 4, and others, "Gents I just got another call from [Foreign Official 2]. We need to wire the payment within the current week."

51.     On or about August 17, 2011, Employee 1 emailed Employee 4 and others, "I just got now a call from the cabinet of [Foreign Official 1]. I really need we to wire the $."

52.     On or about August 18, 2011, Employee 1 emailed Employee 4 and others, attaching an invoice from Consulting Company A requesting the payment of €1,000,000, writing, "Hi, please find attached the invoice signed by me. Tell me what can I do to make this happen fast. I am getting strong pressures from [Foreign Official 1]. This is not nice."

53.     On or about August 18, 2011, Employee 2 emailed Employee 1 and Employee 4, and others, "As you said on your email below we have to pay the invoice ASAP . . . Everybody in the management of [Telecom Company A] & in the ministry are waiting their part of the cake."

54.     On or about August 22, 2011, Employee 2 emailed Employee 1, Employee 4, and others, attaching a draft due diligence report on Consulting Company A.  The draft due diligence report failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2.

55.     On or about August 24, 2011, Ericsson AB's branch office in Dubai transferred approximately $1,441,050 – the approximate equivalent at the time of €1,000,000 – to Consulting Company A.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

56.     On or about August 29, 2011, Employee 2 emailed Employee 4 a second invoice from Consulting Company A, requesting a payment of €122,000 for 610 hours of purported work that was never performed.

57.     On or about October 27, 2011, Ericsson AB's branch office in Dubai transferred approximately $171,703 – the approximate equivalent at the time of €122,000 – to Consulting Company A.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

58.     On or about January 27, 2012, Employee 2 sent Employee 4 a third invoice from Consulting Company A, requesting a payment of €414,000 for 2,070 hours of purported work that was never performed.

59.     On or about March 9, 2012, Ericsson AB's branch office in Dubai transferred approximately $545,230 – the approximate equivalent at the time of €414,000 – to Consulting Company A.  Bank records show that the funds were through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

60.     On or about June 30, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

61.     On or about December 28, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit

of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

62.     Ericsson AB continued to perform on the Telecom Company A contract through 2014.

63.     In or about January 2014, Ericsson AB sent an invoice to Telecom Company A in order to receive the final payment under the Telecom Company A contract.

64.     On or about January 31, 2014, Ericsson AB received its last payment for its performance on the Telecom Company A contract.  LM Ericsson, through Ericsson AB, earned approximately $7,000,000 in profits from the Telecom Company A Contract.

### Overview of the Scheme in China

65.     In or about and between at least 2000 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, EHK, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, caused tens of millions of dollars to be paid to various agents, consultants, and service providers in China, at least a portion of which was used to provide things of value, including leisure travel and entertainment, to foreign officials, including employees of Telecom Company B.

66.     Additionally, in or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, made payments to third party service providers pursuant to sham contracts for services that were never performed. The purpose of these payments was to allow Ericsson China to continue to use and pay third party agents in China in contravention of Ericsson's policies and procedures.  LM Ericsson, through certain of its employees and agents, knowingly

mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated books and records.

**Details of the Payments in China Pursuant to Sham Service Provider Agreements**

67.     In or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including Ericsson China, made approximately $31,500,000 in payments pursuant to sham service provider agreements under which no legitimate services were rendered. These payments were made so as to continue to use and pay third party agents in China in contravention of LM Ericsson's policies and procedures.

68.     Specifically, in or about 2011, LM Ericsson instructed senior executives, including Employee 5, that all sales agent agreements needed to be terminated.  In or about 2013, LM Ericsson formalized this policy change to prohibit the use of third party agents, except in cases where legally required or necessary for a specific business reason (the "New Agent Policy").

69.     In spite of this, Employee 5 determined that it was important for LM Ericsson's business in China to continue to engage third party agents that had strong connections to LM Ericsson's state-owned customers.

70.     Employee 5 instructed Employee 6 to work with others, including Employee 7, to create a structure that would allow Ericsson China to continue to work with and pay third party agents despite the New Agent Policy.

71.     Employee 6 and Employee 7, with the knowledge, assistance, and direction of Employee 5, caused ENC to enter into False Service Agreements (the "False Service Agreements") and to sign purchase requests and approve invoices with pre-existing approved service providers, including consulting companies associated with Sales Agent 1 and Sales Agent

3.   The services contemplated in the False Service Agreements, purchase requests, and invoices were never intended to be provided. Further, the False Service Agreements were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy.  For example,

a.      On or about January 1, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 3.

b.      On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

72.     In or around 2015, Employee 5 instructed Employee 8 to work with others to create a new and more complicated structure of agreements with third party providers to enable Ericsson China to continue working with and paying third party agents in violation of the New Agent Policy.

73.     In or around 2015, Employee 8, and others, with the knowledge, assistance, and direction of Employee 5, caused CBC to enter into False Service Development Agreements (the "False Service Development Agreements") and to sign purchase requests and approve invoices with newly established third party service provider companies, all of which were associated with pre-existing agents, specifically Sales Agent 1 and Sales Agent 3.  The services contemplated in the False Service Development Agreements, purchase requests, and invoices were

never intended to be provided.  Further, the False Service Development Agreements, were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy.

74.     Certain employees and agents of LM Ericsson knowingly caused the payments related to False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records.  For example,

a.     On or about July 11, 2014, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $879,955.22 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

b.     On or about July 27, 2013, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,059,999.98 to a consulting company associated with Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

c.     On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

d.     On or about January 14, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $427,902.46 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

e.     On or about April 20, 2015, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, and Employee 8 caused CBC to enter into a False Service Development Agreement with a consulting company associated with Sales Agent 3.

f.     On or about September 1, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,301,765.16 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

g.     On or about September 3, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,135,700.06 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

h.     On or about September 12, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $764,419.45 to a consulting company associated Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

**Details of the Agent Payments in China to Cover Expenditures for Gifts, Travel, and Entertainment**

75.     Since at least in or about the early 1990s, LM Ericsson, through certain of its employees and agents, including ENC, CBC, and EHK, had an expense account (the "Travel Expense Account") that covered expenses on behalf of agents and customers in China, including gifts, travel, and entertainment for customers from state-owned telecommunications companies, that had no legitimate business purpose.  The Travel Expense Account was largely associated with Sales Agent 2 and was used to pay for gifts, travel, and entertainment for Ericsson's state-owned customers in China, including Telecom Company B, as well as to cover Sales Agent 2's own travel expenses.   Certain employees of LM Ericsson and Ericsson China used the Travel Expense Account to win business with state-owned customers, including Telecom Company B.  The total historical spend through the Travel Expense Account was tens of millions of dollars.

76.     The Travel Expense Account covered travel for delegations of Chinese government officials and sales and procurement managers of state-owned customers, including Telecom Company B, on trips to international destinations, including to the United States, which had little to no apparent business purpose.  The trips include, among others:

a.     In or around and between April 2007 and May 2007, Ericsson China paid for a delegation of Chinese government officials and high-level employees of Telecom Company B to go on a 16-day trip to Canada, the United States, and the Caribbean, including a week-long luxury cruise that included ports of call in Barbados, St. Lucia, Antigua, and St. Martin. Only two hours of the 16-day trip were reserved for meetings at Ericsson's offices in Canada.

b.     In or around May 2013, Ericsson China paid for a delegation of Chinese government officials to go on a trip to the United States and the United Kingdom, with

stops in Palo Alto, CA (with accommodations at the Four Seasons Hotel), Las Vegas, NV, Phoenix, AZ, Chicago, IL, and London, England.

77.     In or around 2008, in an effort to conceal the continued existence of the Travel Expense Account from LM Ericsson's headquarters, Employee 5, Employee 6, and others, came to an arrangement with a consulting company of Sales Agent 1 for Sales Agent 1 to cover the expenses associated with the Travel Expense Account, and then to seek reimbursement for the associated expenses from EHK.  EHK also provided Letters of Guarantee to certain vendors, including a luxury hotel and a travel agency, associated with the Travel Expense Account in order to guarantee that EHK would be responsible for any expenses that Sales Agent 1 failed to cover.

78.     In or around 2013, in light of the New Agent Policy, and to further conceal the Travel Expense Account, Employee 5 instructed Employee 6 and Employee 7 to continue to have Sales Agent 1 cover the expenses associated with the Travel Expense Account, but to reimburse Sales Agent 1 through the False Service Agreements and the False Service Development Agreements.

79.     In or about and between 2013 and 2015, LM Ericsson, through certain of its employees and agents, including ENC, CBC, EHK, Employee 5, Employee 6, Employee 7, Employee 8, and others paid approximately $19,500,000 to cover the expenses associated with the Travel Expense Account.  Most of these expenditures related to travel for Chinese government officials and employees of state-owned customers, including Telecom Company B, which had no apparent business purpose, including the previously described customer trip to the United States in 2013.

80.     Employee 5, Employee 6, Employee 7, Employee 8, and others knowingly caused CBC to sign purchase requests and approve invoices submitted by third party service providers pursuant to the False Service Agreements and False Service Development Agreements for services that were never provided.  The true purpose of the false purchase requests was to cover the expenses associated with the Travel Expense Account.  These fake purchase requests and false invoices were used to justify making the payments to third party service providers.

81.     Certain employees and agents of LM Ericsson knowingly caused payments related to the False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records.

### The Scheme in Vietnam

82.     In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Malaysia, Ericsson Vietnam, Employee 9, and Employee 10, made approximately $4,800,000 in payments, sometimes in cash, to Consulting Company B in order to create off-the-books slush funds to be managed by Sales Agent 4 (a representative of Consulting Company B) and Consulting Company B, with oversight and direction from employees and agents of LM Ericsson's subsidiaries Ericsson Malaysia and Ericsson Vietnam, and Employee 9.

83.     The slush fund accounts were sometimes used to make payments to other third parties who Ericsson employees knew would not be able to pass Ericsson's due diligence processes.

84.     The payments to Consulting Company B were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Vietnam, and Consulting Company B for services that were never performed.  For example,

    a.     In or about July 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Vietnam, Employee 9, and Employee 10, caused Ericsson Vietnam to enter into a sham consultancy agreement with Consulting Company B.

85.     Sales Agent 4 also set up a means by which Sales Agent 4 could quickly transfer cash to third parties.

86.     For example, in January 2014 Employee 9 and Sales Agent 4 discussed via email the need to urgently transfer $25,000 to provide to an individual in Hanoi.  On or about January 21, 2014, an employee of LM Ericsson, known to the Fraud Section, the Office, and the Company, sent Employee 9 and Employee 10 an email with the subject "Update summary [Employee 10]" and the following content: "Hi [Employee 9], Please find a summary of the transfers, Q 64,953 . . . F&S 108,600 . . . Dr 108,600 . . . Taiwan 154,000 . .  Thao 208,700." "DR", "Thao", and "F&S" were identified as sub-agents associated with LM Ericsson's customers in Vietnam, all of which were state-owned.

87.     Employee 10 understood that the slush funds managed by Sales Agent 4 were associated with LM Ericsson's customers in Vietnam.  A portion of the slush funds managed by Sales Agent 4 were given to customers as cash gifts.

88.     LM Ericsson, through certain of its employees and agents, knowingly mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated

books and records.  Some of these payments were improperly recorded as "[Consulting Company B] Supply Cost HQM" to an "External HW, Material Consumption" account.  For example,

a.       On or about December 19, 2012, LM Ericsson, through certain of its agents, caused LM Ericsson to improperly record the payment of approximately $433,604 to Consulting Company B in LM Ericsson's consolidated books and records.

### The Scheme in Indonesia

89.      In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, made approximately $45,000,000 in payments to Consulting Company C in order to create off-the-books slush funds to be managed by Consulting Company C, with oversight and direction from employees and agents of LM Ericsson and its subsidiaries, including Ericsson Indonesia, Employee 5, and Employee 9.  LM Ericsson, through its agents and employees, took active steps to conceal these payments on Ericsson's books and records.

90.      The payments to Consulting Company C were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Indonesia, and Consulting Company C for services that were never performed.  For example,

a.       In or about January 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, caused Ericsson Indonesia to enter into a sham consulting agreement with Consulting Company C.

91.      Toward the end of the scheme, Ericsson made termination payments to Consulting Company C but improperly recorded these payments in a "Customer Service" account connected with a "Cost of Sales" account.

92.     For example, on or about August 7, 2014, a representative of Consulting Company C, whose identity is known to the Fraud Section, the Office, and the Company, sent an email to Employee 9: "[Employee 9], Please see my updated files, attached, which show the current net balance as follows: Entitlements vs. Settlements = $3,625,734 . . Fridge = ($2,374,259) . . . [Other] = ($1,270,899) . . . Operational = ($634,783) . . . Net total = ($654,207)."   Ericsson Indonesia, Employee 9, and others, knew that the "Fridge" account was a cash account that was used for "off the book" expenses, such as pleasure travel to Bali, that certain employees of the Company did not want to record on the Company's books.

93.     LM Ericsson, through certain of its employees and agents, knowingly mischaracterized the above-described payments and improperly recorded them in LM Ericsson's consolidated books and records.   For example,

a.     On or about April 30, 2014, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,329,162 to Consulting Company C to be improperly recorded in LM Ericsson's consolidated books and records.

94.     Some documents suggest a link between the "Fridge" account and the Company's customers in Indonesia, some of which were state-owned.

**The Scheme in Kuwait**

95.     In or about and between 2011 and 2013, LM Ericsson, through certain of its agents, including Ericsson AB, Employee 3, and Employee 11, made a payment of approximately $450,000 to Consulting Company D, at the request of Sales Agent 5, a representative of Consulting Company D.   The payment was not made in compliance with LM Ericsson's internal accounting controls.

96.      In order to conceal the payment to Consulting Company D, agents of LM Ericsson entered into a sham contract with Consulting Company D and approved a fake invoice for services that were never performed in order to paper over the payment.

97.      Specifically, in or around October 2011, Telecom Company C opened a tender for the modernization of Telecom Company C's radio access network in Kuwait.  In response to the tender, Ericsson AB submitted a bid for the project.

98.      In or around October 2011, Employee 11 was in contact with Sales Agent 5.  Sales Agent 5 provided Employee 11 with inside information, including competitor information, about the Telecom Company C tender.  During this time period, Sales Agent 5 and Consulting Company D did not have any formal agreement with LM Ericsson or Ericsson AB.

99.      On or about December 31, 2012, Telecom Company C awarded the tender to Ericsson AB, a contract valued at approximately $182,442,430.

100.      On or about January 28, 2013, Sales Agent 5 sent a text message to Employee 11, "I have told you in the past many times and I will tell you again that will not put you under pressure or ask you to do impossible things [or] have a fight or an argument with you I have a commitment to my friends in Kuwait which I need to fulfil[l] And will not pay it From pocket.  I need you to find a way out for us and quickly."

101.      On or about November 6, 2013, Sales Agent 5 sent an email to Employee 3, "[Employee 11] was told that I have personally paid my friends in Kuwait the amount of 315000 Dollars and in the process we are not friends any more. . . . [Employee 11] said he will come back with an offer the next day.  Two day later he called and made an offer to settle this matter for a payment of 400 k."

102.    On or about December 12, 2013, an Ericsson employee sent an email attaching a draft "Consultancy Frame Agreement" between Consulting Company D and Ericsson AB's branch office in Qatar.  In the email, the employee wrote, "I have been asked to sort out the mess we got into in Kuwait. . . .  I have constructed the attached agreement. . . . I do not want anyone to think that I had anything to do with this just because I am now cleaning it up!"

103.    In or about December 2013, Consulting Company D and Ericsson AB's branch office in Qatar entered into a Consultancy Frame Agreement dated December 10, 2013 (the "Consultancy Frame Agreement").  The agreement stated that Ericsson AB's branch office in Qatar engaged Consulting Company D to supply consulting services "within the area of marketing and sales support to increase customer satisfaction and enhance Ericsson business in Kuwait from the 1st of January 2010 to 31st of December 2012 with the purpose of winning the LTE business with [Telecom Company C]."  These services were never provided.

104.    The agreement also provided that it replaced a "previously signed agreement between the two parties which, due to reasons beyond the control of both parties, has been lost."  This was false.  There was no previously signed agreement.

105.    On or about December 22, 2013, Consulting Company D issued an invoice to Ericsson AB requesting a payment of $450,000 pursuant to the Consultancy Frame Agreement. The invoice called for payment on services that were never performed.

106.    In or around December 2013, Ericsson AB's branch office in Qatar transferred approximately $450,000 to Consulting Company D.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company D's bank account at a bank in Qatar.

107.    In or around 2013, LM Ericsson, through certain of its agents, caused the $450,000 payment to Consulting Company D to be improperly recorded in LM Ericsson's consolidated books and records.

## LM Ericsson's Willful Failure to Implement and Maintain Sufficient Internal Accounting Controls

108.    During the relevant time period, LM Ericsson, through certain of its employees and agents, knowingly and willfully failed to implement and maintain sufficient internal accounting controls, which facilitated the payment of bribes.

109.    Specifically, certain employees of LM Ericsson, Ericsson AB, and subsidiaries thereof, including Employee 3, Employee 4, Employee 5, Employee 6, and Employee 7, who were responsible for implementing and overseeing a system of reasonable internal accounting controls, were made aware of significant control weaknesses, including actions taken by employees and high-level executives to make improper payments to third party agents, yet knowingly and willfully failed to implement sufficient controls, which facilitated the payment of bribes.

110.    For example, with respect to the conduct in Djibouti, Employee 3, Employee 4, and others, who were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that the third party consultant in Djibouti was engaged in bribery, was being paid pursuant to fake invoices, was being paid pursuant to a sham contract, and was being paid despite not performing the services described in the invoices, and Employee 3, Employee 4, and others willfully failed to implement sufficient accounting controls to prevent transactions from being

improperly executed, and to prevent the Company's assets from being misused, in order to continue the bribery scheme.

111.    With respect to the conduct in Kuwait, Employee 3 and others, who were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that a third party consultant in Kuwait was being paid pursuant to a fake invoice, was being paid pursuant to a sham contract, and was being paid despite not performing the services described in the invoice, and Employee 3 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

112.    With respect to the conduct in China, Employee 5, Employee 6, Employee 7, and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in China were engaged in providing gifts, travel, and entertainment to employees of state-owned customers, were being paid pursuant to fake invoices, were being paid pursuant to sham contracts, and were being paid despite not performing the services described in the invoices, and Employee 5, Employee 6, Employee 7, and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and the Company's assets from being misused, in order to continue the improper payments.

113.    With respect to the conduct in Vietnam and Indonesia, Employee 5 and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in those countries were being paid pursuant to fake invoices in order to manage off-the-

books slush funds, were being paid pursuant to sham contracts, were being paid despite not performing the services described in the invoices, and Employee 5 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

114.    In sum, despite the fact that high-level executives at LM Ericsson knew that the internal accounting controls were inadequate, LM Ericsson, as a result of the conduct of certain of its agents, employees, and high-level executives, nevertheless knowingly and willfully failed to implement sufficient controls, which facilitated the payment of bribes.

115.    The failures to implement internal accounting controls included, but were not limited to, controls relating to: (a) proper documentation and accounting for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) due diligence for the retention of third party agents and consultants; (c) ensuring due diligence was completed and a fully executed contract was entered with a third party before the third party could begin providing services; (d) ensuring that payments were commensurate with the services to be performed by third parties and that the services paid for were performed; and (e) oversight procedures by personnel at LM Ericsson for third party retention and payment.

### LM Ericsson's Falsified Books and Records

116.    As a result of LM Ericsson's failure to implement effective internal accounting controls, LM Ericsson, through certain of its employees and agents, disguised in its books and records the $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti.  LM Ericsson, through certain of its employees and agents, also failed to properly record approximately $51,500,000 in payments to third party service providers in China, a subset of which

was used to fund gifts, travel, and entertainment for Chinese foreign officials; the $4,800,000 in payments to a consultant in Vietnam; the $45,000,000 in payments to a consultant in Indonesia, and the $450,000 payment to a consultant in Kuwait.

117.   In connection with these payments, LM Ericsson, through certain of its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered.  The payments were falsely or misleadingly characterized in LM Ericsson's books and records, including as consulting expenses, costs of sale, "external hardware" expenses, "corporate marketing fees," "service fulfillment of contract," or administrative or research and development costs.

118.   With respect to the conduct described above regarding China, approximately $51,500,000 in payments to third party service providers were inaccurately recorded in LM Ericsson's consolidated books and records.

119.   With respect to the conduct described above regarding Vietnam, approximately $4,800,000 in payments to Consulting Company B were inaccurately recorded in LM Ericsson's consolidated books and records.

120.   With respect to the conduct described above regarding Indonesia, approximately $45,000,000 in payments to Consulting Company C were inaccurately recorded in LM Ericsson's consolidated books and records.

121.   With respect to the conduct described above regarding Kuwait, the payment on or about December 30, 2013 of approximately $450,000 to Consulting Company D was inaccurately recorded in LM Ericsson's consolidated books and records.